WINDHAM COUNTY SAVINGS BANK v. J. C. O'GORMAN, Receiver.[1]

December 7, 1896.

Nos. 10,033—(18).

**Pledge of Collateral—Conversion by Pledgee.**

   *Held*, that the finding and decision of the trial court, to the effect that the appellant bank converted certain stock held by it as security for the payment of its claim against the insolvent corporation, is not sustained by the evidence.

Appeal by claimant, Windham County Savings Bank, from an order of the district court for Washington county, Crosby, J., denying a motion for a new trial.    Reversed.

*John M. Gilman* and *E. D. Buffington*, for appellant.

*J. N. Searles*, for respondent.

START, C. J.    In the original action of McKusick against Seymour, Sabin & Company, an insolvent corporation, on May 12, 1884, the respondent, O'Gorman, was appointed receiver of the property of the corporation under the provisions of chapter 76, G. S. 1878 (G. S. 1894, §§ 5889–5911).    The appellant, the Windham County Savings Bank, a creditor, duly filed its claim with the receiver, who contested its allowance.    The trial court found as a fact that the bank had converted certain stock held by it as collateral security for the payment of its claim, which exceeded in value the amount of its claim, and as a conclusion of law disallowed the claim.    The bank appealed from an order denying its motion for a new trial.

The principal contention of the bank in this court is that there was no conversion of the collateral stock shown, and that the trial court erred in so finding and deciding.    The record fully sustains this contention, for it does not show that either Seymour, Sabin & Co. or the receiver ever owned or had any interest in the collateral stock, or that it was the primary fund from which the bank's claim was to be paid.    But, on the contrary, the record shows that the stock was owned, respectively, by F. A. Seymour and J. A. Williams, subject to

[1] Reported in 69 N. W. 317.

the rights of the bank thereto, and that they each consented to and authorized the exchange of the stock for that of another corporation, which exchange the receiver claims was a conversion of the stock as to him, as the representative of the creditors of Seymour, Sabin & Co.

The record in this case discloses the following undisputed facts: The bank held three promissory notes against Seymour, Sabin & Co.,— two for $5,000 each and one for $4,000, in all $14,000,—payable to the order of D. M. Sabin, dated January 12, 1884, each of which was indorsed by the payee and three other indorsers. The bank held as security for the payment of each of these notes 18 certificates, each representing 20 shares of the preferred stock of Seymour, Sabin & Co., in all 360 shares, of the par value of $50 each. This stock was guarantied by the Northwestern Manufacturing & Car Company, a corporation. Twelve of these certificates were issued to F. A. Seymour, whose name appears on the face of each as the person entitled to the stock, and it was certified therein that he was the owner thereof. The other six shares were of like import, and were issued to J. A. Williams. Both Seymour and Williams were strangers to the notes; that is, neither was a party thereto. There is a statement on each note that it is secured by the stock, giving the number of the certificates.

When or by whom these certificates were delivered to the bank does not appear, except that they must have been so delivered prior to February 10, 1885; nor whether there was ever any assignment of them to the bank. But on the back of each of the Seymour certificates there is an undated assignment, executed by him, selling and transferring the shares of stock to the Minnesota Thresher Manufacturing Company; and attached to the Williams certificates there was a power of attorney executed by him, dated July 16, 1885, authorizing the bank, as his attorney, to transfer the stock to the Thresher Company. This assignment and power of attorney were executed after the stock was delivered to the bank, but, as already stated, the specific time when the stock was delivered to the bank does not appear. Neither does it appear from the evidence that either Seymour or Williams ever received any consideration whatever for the pledge of their stock for the payment of the notes of the bank. It is apparent from the record that the reason why there was no evidence on this and other material points was, as we shall presently see, that the

receiver's claim that the bank converted this stock as to him was an afterthought, asserted for the first time during the trial.

The bank, on March 7, 1885, filed its complaint of intervention in the original action, setting up its ownership of the three promissory notes against the corporation, and asking that the amount thereof be allowed and that it be permitted to share as a creditor in the distribution of the assets of the corporation.   The complaint also stated that it held the stock in question.   On May 5, 1885, the receiver filed his answer, alleging, in substance, that the stock held as collateral by the bank was his property, as such receiver, subject to the rights of the bank thereto;   that such stock was guarantied by the Northwestern Manufacturing & Car Company;   that it was primarily liable for the payment of the stock;   that a receiver of the property of the Car Company had been appointed May 12, 1884;   and that the bank had proved its claim on such guaranty against the estate of such corporation, and that the assets in the hands of the receiver were sufficient to pay the claim in full.   The reply of the bank put in issue the allegations of the answer, except that it admitted the appointment of a receiver for the Car Company, and that it had filed its claim on the guaranty as alleged.

No further action was had in the matter for more than seven years after issue was thus joined.   The Minnesota Thresher Manufacturing Company, the corporation named in the assignment of the certificates of stock by Seymour and in the power of attorney of Williams, to which reference has been made, purchased at a receiver's sale all of the assets of the Car Company, and the bank surrendered the preferred stock so held by it to the Thresher Company, and took in exchange as a substituted collateral the preferred stock of the Thresher Company to the amount of $19,250 par value, which it still holds.

Afterwards, on November 16, 1892, the receiver filed an amended answer to the bank's complaint of intervention (which, of course, took the place of the original), in which he made no claim that he, as such receiver, or the corporation of Seymour, Sabin & Co., had, or ever had, any interest in the preferred stock held by the bank.   On the contrary, he denied in his answer that the corporation ever made the notes held by the bank, or received any consideration therefor, and alleged that certain pretended officers of the corporation, secretly and without authority, and for their own benefit, issued the notes in the

name of the corporation.    He further alleged on information and be-
lief that the special preferred stock held by the bank was issued with-
out the authority or knowledge of Seymour, Sabin & Co., its stock-
holders or directors, and in violation of their directions. This amended
answer was verified by the receiver.    The allegations of this answer
were deemed denied by stipulation of the parties.

There was no evidence in the case that the corporation of Seymour,
Sabin & Co. was authorized to own, hold, or pledge its own stock,
preferred or otherwise.    On the trial the principal claim of the re-
ceiver, which he sought to establish, was that the corporation never
made the notes in question, and was not liable thereon; but, after
it appeared from the evidence that the bank had exchanged the col-
lateral stock for the stock of the Thresher Company, he claimed that
the bank had converted the stock originally held by it, and the trial
court so found and decided.

If it had been shown in this case that Seymour, Sabin & Co. owned
or had any interest in the pledged stock, or that it was the primary
fund for the payment of the notes held by the bank, it would be true,
as claimed, that, the corporation being insolvent, and its affairs in
process of being wound up by a receiver, an equity would arise in
favor of the other creditors, which would require the bank to exhaust
or surrender to the receiver its collateral before participating in the
fund in court.    In such a case this equity could not be impaired by
the bank releasing or exchanging the collateral without the consent
of such creditors, and the exchange of the stock of Seymour, Sabin
& Co. for that of the Thresher Company by the bank, without such
consent, would be a conversion as to the receiver representing credit-
ors.    But this is only an abstract proposition in this case, for there is
nothing in the record to support the hypothesis upon which it rests.

It is suggested that it does not appear from the evidence that the
owners of this stock pledged it as security for the debt of the corpo-
ration without any consideration from it, and for its accommodation.
The burden, in view of the special facts in this case, was on the
receiver to establish that the corporation had some interest or equity
in the stock; not on the bank to prove a negative, that it had no
such interest.    The bank was not the original payee of the note, but
D. M. Sabin; and there is nothing in the case to show that the stock
in question was ever pledged by its owners as security for the pay-

ment of these notes until they were transferred by Sabin to the bank, or that the stock was not so pledged for the accommodation of Sabin. But, whatever the fact may have been, the relation of the corporation to this stock, and its interest therein, if any, were matters peculiarly within the knowledge of the corporation and the receiver. The bank was without such knowledge. In exchanging the collateral it acted without any notice of any supposed claim of the corporation, upon the apparent absolute ownership of the stock by Seymour and Williams, and exchanged the stock for the substituted collateral by virtue of the assignment and power of attorney made by such owners after the stock had been pledged. This shows that they still claimed to be the owners of the stock, and were exercising acts of ownership as to it.

It is claimed in the brief of the respondent that the failure of the receiver to show that either he or the corporation had any interest or equity in the stock was not urged in the court below. This is substantially true. But the question of conversion was not litigated, except incidentally. The receiver stood upon the defense made in his amended answer, that the corporation never made the notes, and that it never issued the stock; that is, he repudiated any claim to the stock, and insisted that it had no legal existence. That there was no abandonment of the issues tendered in the amended answer, or addition of any new ones, is apparent from the claim of the attorney of the receiver, made near the close of the trial, who then for the first time stated that there were only three propositions in this case: (1) the conversion of the collaterals; (2) whether, under the stipulation, that conversion can be shown as a defense; (3) whether, under the circumstances that these notes were issued, the corporation exceeded its powers, and whether, as a matter of law, that can be considered as a defense. It is unnecessary to discuss the stipulation referred to, for it did not change the issues, or allude in any manner to the conversion of the stock.

In a word, the record shows that the exchange of collaterals was made by the bank with the consent and express authority of the parties owning the stock originally pledged, and it does not show that Seymour, Sabin & Co., or its receiver, had any interest or equity therein, but does show that the receiver repudiated both the notes and the stock pledged for their payment. The finding and decision of the

trial court that the bank converted the stock is, therefore, wholly unsupported by the evidence, and a new trial must be granted.

With reference to such trial, it is only necessary to add that, if it shall be established that Seymour, Sabin & Co. was the owner, equitable or otherwise, of the stock, or that it was the primary fund for the payment of the notes, then the exchange of collaterals by the bank without the consent of the receiver was a conversion of the original stock, and it must account with the receiver in the adjustment of the amount of its claim against the corporation for the value of the stock at the time of such exchange or conversion. And, further, that the fact that J. C. O'Gorman, the receiver, witnessed the transfer of the stock, does not prove that he consented, as receiver, to such exchange of collaterals. He could not so assent without the permission and authority of the court.

Order reversed, and new trial granted.

CANTY, J. (dissenting). I cannot concur in the foregoing opinion. In 1884, Seymour, Sabin & Co., a corporation organized under the laws of this state, was insolvent, and McKusick, one of its creditors, commenced the original action against it under G. S. 1878, c. 76 (G. S. 1894, §§ 5889–5911), to have a receiver appointed, its assets sequestered, and their proceeds distributed among its creditors. A receiver was appointed, and, pursuant to an order of the court requiring the other creditors to present their claims and become parties to the action, the appellant bank filed its claims, and became a party. The matter dragged along until 1894, when a trial was had on the claim before the court without a jury, and from an order disallowing the claim the bank appeals.

The appellant claims on three promissory notes aggregating $14,000 and interest, made to it by Seymour, Sabin & Co. The defense is that appellant held, as collateral security for the payment of these notes, 360 shares of the special preferred stock of Seymour, Sabin & Co., of the aggregate face value of $19,000, the payment or redemption of which stock was guarantied by the Northwestern Manufacturing & Car Company, another corporation; that this stock was converted by appellant, and was of greater value than the amount of appellant's claim. This the court below found to be true. Two days after this suit was commenced, a similar suit was commenced against

the Car Company, and a receiver was appointed for it also.  Thereafter, in February, 1885, appellant transferred and delivered such collateral so held by it to the Minnesota Thresher Manufacturing Company, a corporation then lately organized, and in consideration thereof received from the latter corporation its special preferred stock to the amount of $19,250.  This is the transaction which the court finds to be a conversion of the collateral.

Appellant contends that this exchange of stock was not a conversion, because the Seymour, Sabin & Co. stock was issued part in the name of one Seymour and part in the name of one Williams, and on the back of the Seymour certificates, as introduced in evidence, there appears the written transfer of Seymour to the Thresher Company, and with the Williams certificates appears his written power of attorney authorizing appellant to transfer his stock to the Thresher Company.  I cannot agree with appellant.

It sufficiently appears from the evidence and admissions in the record that neither of these transfers of Seymour, nor this power of attorney from Williams, were made as a part of the original transaction of putting up this stock as collateral, but were all made afterwards.  But conceding, for the purpose of the argument, that, as appellant contends, and the majority holds, the record shows that Seymour and Williams are the owners of this stock, subject to the rights of the appellant bank, it does not follow that the consent of Seymour and Williams alone was sufficient to prevent the transaction from being a conversion of the collateral as to the other creditors of Seymour, Sabin & Co.  It nowhere appears that Seymour and Williams, or either of them, put up this stock as collateral security without any consideration running to them, and for the mere accommodation of Seymour, Sabin & Co.  No such suggestion or claim is made anywhere in the record.  For all that appears, this stock may be the primary fund out of which the claim of appellant should be paid.

In the condition of this record it cannot be presumed that this stock was such a mere accommodation surety.  When the latter corporation became insolvent, and its assets were sequestered by the court, an equity arose in favor of its other creditors that appellant should exhaust its collateral security or surrender it to the receiver before participating in the fund in court.  This equity could not be defeated, evaded, or modified by the independent action of the appellant and

Seymour and Williams.   When the insolvent estate is thus seques-
tered, this equity becomes a fixed right, which cannot be defeated by
the secured creditor releasing the security without the consent of the
other creditors.   If he cannot release it, he cannot barter it off for
something else, without being liable to be charged by the other credit-
ors with conversion, when he comes to participate in the common fund
in court.   Then, as to such other creditors, appellant was guilty of
converting the collateral.

The majority hold that we must presume that this collateral was
mere accommodation security.   The effect of such decision will be
that in every case where an insolvent estate is being administered in
court for the benefit of all the creditors, a creditor holding collateral
security may come in and participate in the fund equally with the un-
secured creditors for the whole amount of his claim, though he has
converted the security, or still holds it unexhausted, unless the other
creditors are able to prove affirmatively that such collateral security
was not put up by the third party owning the same, or the third party
in whose name it was issued, as mere accommodation security, and
without any consideration running to him.   I cannot consent to such
a shifting of the burden of proof on to the general creditors, who are
total strangers to the whole transaction, and are not presumed to
have knowledge of the facts.   If the appellant bank desired to justify
its conversion, or apparent conversion, of the collateral, the burden
was on it to show that such collateral was such mere accommodation
security.

The majority seem to lay stress on the indefiniteness of the issues,
and the failure of the receiver in his answer to set up the defense of
conversion.   It was not necessary for the receiver, or any one else in
the case, to answer or reply to appellant's pleading at all, but his
claim stood denied by all other parties.   See Pioneer Fuel Co. v. St.
Peter St. Imp. Co., 64 Minn. 386, 67 N. W. 217.

MITCHELL, J. (dissenting).   The only difference of opinion be-
tween us seems to be as to the burden of proof.   Undoubtedly the
burden was on the receiver to prove a conversion.   But when he
proved that the bank held collateral security which it had disposed of
without applying the same on its claim, I think he had made out a
prima facie case;   and, if there were any facts which would show that

no equity existed in favor of other creditors as to the disposition and application of this collateral, the burden was on the bank to prove them. I do not think that any facts were disclosed by the evidence which disproved, at least conclusively, the existence of such an equity, or rebutted the prima facie case made out by the receiver. I therefore unite in the dissent of Justice CANTY.

COLLINS, J. (concurring). If nothing had appeared on the trial of this cause in relation to the Seymour and Williams stock except that they were held by the bank as collateral, it is probable that, as contended by the dissenting members of the court, the burden would be on the bank to show that the creditors of Seymour, Sabin & Co. had no equities therein at the time the collateral was exchanged. But when it was made to appear that the original collateral was the property of Seymour and Williams, that they exercised acts of ownership over it while it was in the hands of the bank, and that the latter made the exchange, presumptively in good faith, by their express authority and direction, the burden, in my opinion, was shifted upon the receiver to show that, as the representative of the creditors, he had some interest therein. I concur in the views expressed by the Chief Justice.